IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF TENNESSEE
KNOXVILLE DIVISION

ALFRED L. FRAZIER,                    )
                                      )
            Plaintiff,                )
                                      )
                                      )
v.                                    )          No. 3:09-CV-242
                                      )
VITRAN EXPRESS, INC.,                 )
                                      )
            Defendant.                )

## MEMORANDUM OPINION

This civil action is before the court for consideration of the "Motion for Summary Judgment" [doc. 25] filed by defendant Vitran Express, Inc. ("Vitran"). Plaintiff has responded [docs. 29, 30], and defendant has filed a reply [doc. 32]. Oral argument is unnecessary, and the motion is ripe for the court's determination.

Plaintiff has brought suit for alleged violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-1 et seq., and 42 U.S.C. § 1981.[1] He contends that his employment was unlawfully terminated because of his race, African American. For the reasons that follow, the motion will be granted, and this case will be dismissed.

_____

[1] An agreed order [doc. 9] was entered dismissing plaintiff's claim under the Tennessee Human Rights Act. In addition, while in his response plaintiff seeks "voluntary dismissal" of his breach of contract claim based upon the employee handbook, plaintiff cannot take such dismissal without court order because a motion for summary judgment is pending. Federal Rule of Civil Procedure 41. There is no basis for the court to allow such a dismissal. The supporting documentation provided with defendant's motion makes clear that plaintiff's claim for breach of contract has no merit. Thus, defendant is entitled to summary judgment on this claim.

*Background*

Plaintiff was hired by defendant in August 2005 as a city driver in its Knoxville, Tennessee terminal. Defendant operates a less-than-truckload trucking company that employs city and linehaul drivers to deliver freight to its customers. At the time plaintiff was hired, the terminal manager was Mike Hudson. Sam Elliott replaced Hudson as the terminal manager in April 2007. Plaintiff was the only African American associate in the Knoxville terminal.

In the disciplinary context, defendant uses Need for Improvement Notices ("NFI"). In the 24 months of plaintiff's employment with defendant, he received eleven NFIs including the one involved in his termination in August 2007. The NFIs issued to plaintiff generally involved issues concerning work habits, cooperation, and attendance. With regard to one NFI, plaintiff says that Elliott yelled at him in front of co-workers when he did not bring back bills of lading. Plaintiff says he was sick that day. Several of the NFIs reflect that plaintiff disputed the facts and refused to sign the form. On May 17, 2007, plaintiff received his ninth NIF that resulted in a suspension from work. Elliott instructed plaintiff to pick up freight at a customer's facility in Vonore, Tennessee. Plaintiff told Elliott that he had clocked out for the day and that he was going home and would not do the assignment. Consequently, plaintiff was suspended. A telephonic Policy and Performance Review Conference ("PPRC") was conducted with Jeff Deaton, Vice President of Human Resources

and Human Resources Director Terri Winters. At the conference, plaintiff's past NIFs were discussed as well as his "regularly refusing directives and lack of cooperation when being issued late in the day runs." Plaintiff was returned to work with the "directive to improve with his cooperation with local supervisors and dispatch." Plaintiff received another NFI on July 17, 2007 for a minor infraction regarding failing to follow defendant's policy by checking a box marked "shrink wrapped."

On August 3, 2007, the incident occurred which resulted in plaintiff's termination. Plaintiff was sent to GE, one of defendant's largest customers if not the largest customer for the Knoxville terminal, to pick up one pup.[2] After plaintiff arrived, the customer told him there was a second loaded pup to be taken as well. Plaintiff denies that the pup was ready when he arrived. He told the customer that he could not take the second load because he had an emergency at home with his girlfriend who had fallen getting out of the tub. At some point he also told defendant that part of the emergency was that he was concerned about some smoke in this house from wiring that was being worked on.[3]

---

[2] A "pup" is a trailer that is 24feet to 28feet in length.

[3]
| | | |
|---|---|---|
| | Q. | Okay. Do you recall telling anyone that there was an electrical problem at your house and there was smoke and you had to go see Cathy because there was an emergency due to that smoke? |
| | A. | No. Here's what I said. I said that I had had a problem with some electrical and I was concerned that that might be a possibility, that I needed - - because I needed to go also because that could be a possibility, you know, |

(continued...)

3

The GE employee who requested plaintiff hook up the second pup, Dorothy

Rush, called Vitran when plaintiff refused the request and spoke with Doug Kitts. After she

informed Kitts of plaintiff's refusal, she turned the phone over to the plaintiff. Kitts

informed the plaintiff that he needed to get the pup. Plaintiff told him about the emergency

and that he needed to go. Kitts repeated that plaintiff needed to take the pup. Plaintiff again

referenced the emergency, and Kitts told plaintiff for the third time to take the pup. Before

leaving he had a conversation with Rush that he testified to in his deposition as follows:

> Q.      You didn't have a conversation with Dorothy after your
>         conversation with Mr. Kitts was over?
>
> A.      Yes, on the way out the door, I was telling Dorothy that
>         I can't believe this guy didn't acknowledge that, you
>         know, that I had an emergency. Can you believe that
>         about Doug? I mean, gosh, I thought these guys would,
>         you know, I'm having this conversation, saying - - so I

---

[3](...continued)

> that thing could, you know, flare up, too.
>
> Q.      Who did you say that to?
> A.      I don't recall who that was. I talked to maybe Jeff Deaton during a conference call. Maybe I talked - -
> Q.      So you had to go because Cathy fell and because you were concerned about an electrical problem?
> A.      No. As an additional thing. You asked me about the electrical, and I said I was concerned about that also.
> Q.      Didn't you just say that you told Jeff Deaton about the electric - -
> A.      There's a possibility that I talked to Jeff Deaton about that, yes.

4

said, Dorothy, I said, this thing might get ugly. You know, I don't know what's going to happen here with this being some things that's happening to me. So, you know, I'm going to need you to witness. I told him that I had an emergency and he's not acknowledging it. And I'm talking and I'm - - we were just - - that was during the time I was giving her the paperwork and gathering up my stuff and my copies, just talking and giving her the papers, you know. Not ranting and raving, just talking in general and saying, you know, I said, I might need you to be a witness to this, this - - that he didn't acknowledge I had an emergency because this thing might get ugly Dorothy. And she said, "I'm not going to be a witness for nobody."

Q.     Okay.

A.     And that's when I said, well, okay, I understand that. Maybe you could probably, you know, if I have to ask if this thing gets out of hand, maybe I could have you subpoenaed if you can't get off to help me. And that was the end of it.

Plaintiff returned to the terminal with the pup he was originally sent to pick up.

Elliott had gone home for the day but received a call about the incident from Kitts. Elliott said he would return to the office and did so. At the office, Elliott prepared an NFI concerning the incident. When plaintiff returned, he secured the load. Elliott told him he was to call Jon Hartman, Vice President of Operations. According to plaintiff's testimony, Hartman told him he should have gotten the trailer. Plaintiff testified that Hartman or Elliott or both of them told him he was suspended until further notice.

Elliott called Rush to apologize for the incident and later on the evening of August 3, 2007, sent an email to Terri Winters with a copy to Hartman. The email states in

5

part:

> Alfred Frazier was sent to General Electric DC in Mascot, TN to swap an empty pup for a loaded pup. When Mr. Frazier got to GE a second loaded pup was ready to go. The Knoxville Service Center keeps an extra dolly at GE just for occasions such as this. The OB Supervisor told Mr. Frazier to go ahead and get both trailers while he was there. Mr. Frazier said that he had just got an emergency call to come home and he was not going to hook a set of pups. He was coming in to clock out. Mr. Frazier would not respond to numerous attempts to contact him on the company radio by the OB Supervisor after that. While Mr. Frazier was in the GE Shipping office he began to get out of control with anger because of this. The statement that was given to me by Dorothy Rush, the GE shipping associate is. **"When your dispatcher told Al to get both trailers he got really mad. He started talking about taking Vitran to court and told me that I was going to court with him. I told him that I was not going to court with him. Al told me that he would have me subpoenaed to court**."
>
> . . .
>
> I called the VP of Operations Jon Hartman and described the incident with Alfred Frazier. Jon Hartman told me to notify Mr. Frazier that he is officially suspended pending the out come (sic) of a Policy Performance Review Call with HR. (emphasis in original)

On Monday, August 6, 2007, Albert Collver, a Manager in Distribution

Operations & Customer Service at GE in Mascot, TN sent an email to Hartman with a copy

to Elliott and others. The email states:

> Wanted to touch base with you regarding the incident at GE Mascot DC on Friday August 3rd between your driver (Al Frazier) and our 2nd shift dispatcher Dorothy Rush. Typically this type of issue would be addressed by Dan Trotter but he is on vacation this week.

6

> According to Dorothy, Al was asked over the phone (by Vitran's Dispatch) to pick up two full pups that were loaded @ GE instead of the one he was instructed to pick up. Apparently Al did not want to pull back the 2nd pup even though Vitran had a spare dolly on GE's lot. He told Dorothy that he was going to sue Vitran and that he was going to take Dorothy to court with him. When she told Al she would not go to court he said he would subpoena her.
>
> It is bad enough to refuse to pickup our fright but threatening one of our employees is simply unacceptable. Hopefully this is not indicative of how your drivers behave when trying to deliver shipments to our customers. Please inform Mr. Frazier that any further incidents will result in his prompt removal from our facility.

Plaintiff points out that at his appeal hearing regarding unemployment benefits Elliott testified that GE did not contact him directly until Monday, August 6, 2007, with the email from Collver to Hartman with the information about the subpoena issue. He stated to the hearing officer that the incident was on August 3rd, but he did not know about the subpoena threat until August 6th.

On August 20, 2007, a PPRC call was held with plaintiff, Deaton, Winters, and Elliott that resulted in plaintiff's termination.[4] The notes from that call state in their entirety as follows:

> While Al's explanation of what happened on that day is highly problematic at best with regards to a family emergency, it is the unacceptable behavior he displayed with our customer that led to our decision. Notice from our customer GE Consumer &

---

[4] The record indicates that plaintiff had been requested to provided proof of the medical emergency and smoke situation on the date of the GE incident. He requested two weeks to gather the information.

7

Industrial that their dispatcher Dorothy Rush was told by Al Frazier he would be suing Vitran and that he was going to take Dorothy to court with him. When she told Al she would not go to court he said he would subpoena her. The following is a quote from Albert B. Coliver Jr. (sic) GE Mgr. Distribution e-mail from 08/06/07, "It is bad enough to refuse to pickup our fright but threatening one of our employees is simply unacceptable." GE is one of our largest customers in the KNO facility. Now that we have received all of the necessary documents from Al, and have reviewed all of the facts leading up to his suspension, it is agreed that Al is to have his employment with Vitran Express terminated on the basis of threatening a customer.

At his deposition, plaintiff was asked if he knew who made the decision to

terminate his employment. He did not.

> Q.   Do you know who made the decision to terminate your employment?
>
> A.   No, sir, I really can't just say who made the decision. Out of the group I can't say who did.
>
> Q.   One of the allegations that you're making in this case, Mr. Frazier, is that you were terminated because of your race; is that correct?
>
> A.   Yes.
>
> Q.   But you don't know who made the decision to terminate your employment?
>
> A.   Out of the group of people, no, I don't.

II.

*Standard of Review*

Defendant's motion is brought pursuant to Federal Rule of Civil Procedure 56, which governs summary judgment.[5] Rule 56(a) sets forth the standard for governing summary judgment and provides in pertinent part: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The procedure set out in Rule 56(c) requires that "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion." This can be done by citation to materials in the record, which include depositions, documents, affidavits, stipulations, and electronically stored information. Fed. R. Civ. P. 56(c)(1)(A). Rule 56(c)(1)(B) allows a party to "show[] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."

After the moving party has carried its initial burden of showing that there are no genuine issues of material fact in dispute, the burden shifts to the non-moving party to present specific facts demonstrating that there is a genuine issue for trial. *Matsushita Elec.*

---

[5] Federal Rule of Civil Procedure 56 was amended effective December 1, 2010. The Advisory Committee Notes to the 2010 amendments reflect that the standard for granting summary judgment "remains unchanged," and "[t]he amendments will not affect continuing development of the decisional law construing and applying [that standard]." Fed. R. Civ. P. 56 advisory committee's note. The summary judgment motion in this case was filed after the revised version became effective and therefore is governed by that version. *Cf. Wheeler v. Newell*, 407 F. App'x 889, 891 n.3 (6th Cir. 2011) ("The motion for summary judgment in this case was filed prior to December 1, 2010, and is governed by the version of Rule 56 that was in effect at the time the motion was filed.").

*Indus. Co., v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). "The 'mere possibility' of a factual dispute is not enough." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992) (citing *Gregg v. Allen-Bradley Co.*, 801 F.2d 859, 863 (6th Cir. 1986)).

In order to defeat the motion for summary judgment, the non-moving party must present probative evidence that supports its complaint. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986). The non-moving party's evidence is to be believed, and all justifiable inferences are to be drawn in that party's favor. *Id.* at 255. The court determines whether the evidence requires submission to a jury or whether one party must prevail as a matter of law because the issue is so one-sided. *Id.* at 251-52.

### III.

### *Analysis*

Plaintiff is an African American male who contends that he was terminated from his job because of his race and also that he was treated differently than white employees. Title VII makes it illegal for an employer to "fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).[6] To

---

[6] The claim raised pursuant to § 1981 is analyzed under the same framework as Title VII. *Newman v. Fed. Express Corp.*, 266 F.3d 401, 406 (6th Cir. 2001); *Wade v. Knoxville Utils. Bd.*, 259 F.3d 452, 464 (6th Cir. 2001) (citing *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992)).

(continued...)

10

withstand a motion for summary judgment in a Title VII case, the plaintiff must present direct evidence of discrimination or present circumstantial evidence through a prima facie case. *See Mitchell v. Toledo Hosp*., 964 F.2d 577, 582 (6th Cir. 1992). There is no direct evidence of discrimination in this case; therefore, plaintiff must establish a prima facie case using the well known and established *McDonnell Douglas/Burdine* burden-shifting framework.[7]

---

[6](...continued)
Thus, the court's analysis and conclusions concerning plaintiff's Title VII claims apply equally to and are dispositive of the claims brought pursuant to § 1981.

[7] Included in plaintiff's response materials is the following excerpt from Joe Kitts's deposition:

> Q.   Do you recall making a statement, "Nobody cares what you say or think; you're a black man; just like me, I'm a fat man"?
> A.   Not at all.
> Q.   Okay. You deny you made that statement?
> A.   I don't remember it. I mean, you know, there's - - it's 2006 to 2011, you know. I mean, I don't remember it, but, you know - - and I guess, yeah, I deny it, because I don't - - I think I would remember saying something like that, especially, you know, to a colored man.

First of all, there is no proof that the statement was made. All that is in the record is this questioning by plaintiff's counsel and Kitts's denial. Nevertheless, assuming the statement was made in an effort to consider the evidence in the light most favorable to the plaintiff, the remark does not satisfy plaintiff's burden of showing animus. There is no proof when the remark would have been made or what Kitts's status was at the time. Further, the record demonstrates that Kitts had no part in the decision making process regarding plaintiff's termination. "[S]tatements by non-decision makers, or statements by decision makers unrelated to the decisional process itself [cannot] suffice to satisfy the plaintiff's burden in demonstrating animus." *Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544, 550 (6th Cir. 2004) (quoting *Bush v. Dictaphone Corp*., 161 F.3d 363, 369 (6th Cir. 1998)). Thus, the court will not rely on this deposition testimony.

11

To establish a prima facie case of racial discrimination, plaintiff must show that 1) he is a member of a protected class; 2) he was qualified for the job; 3) he suffered an adverse employment decision; and 4) he was replaced by someone outside the protected class or treated differently than similarly situated persons who were not in the protected class. *Arendale v. City of Memphis*, 519 F.3d 587, 603 (6th Cir. 2008); *accord McClain v. Nw. Cmty. Corr. Ctr. Judicial Corr. Bd.*, 440 F.3d 320, 332 (6th Cir. 2006). Once the plaintiff has established a prima facie case, the burden shifts to the defendant to "articulate some legitimate, nondiscriminatory reason" for its employment action. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). The defendant does not need to prove the nondiscriminatory reason but needs to "merely articulate a valid rationale." *Hartsel v. Keys*, 87 F.3d 795, 800 (6th Cir. 1996) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 514 (1993)). If the defendant meets its burden, the burden then shifts back to the plaintiff to show that the defendant's proffered reason was not the true reason but merely a pretext for discrimination. *Burdine*, 450 U.S. at 253.

Defendant argues that plaintiff cannot establish a prima facie case because he cannot demonstrate the fourth element, that he was treated less favorably than employees who were not members of his protected class. For the reasons that will be discussed, the court agrees that plaintiff cannot show a prima facie case on this basis. However, in his response, plaintiff presented in the deposition testimony of Samuel Elliott that demonstrates

12

plaintiff was replaced by a white male, Ronnie Angel. This fact is sufficient to establish a prima facie case, as there is no dispute that plaintiff can establish the other three required elements. Nevertheless, because the complaint contains allegations concerning disparate treatment, the court will address the similarly situated element at the prima facie level as well.

"Disparate treatment occurs when an employer treats some employees less favorably than others because of race, religion, sex, or the like." *Huguley v. Gen. Motors Corp*., 52 F.3d 1364, 1370 (6th Cir. 1995). "To prevail on a claim of disparate treatment a plaintiff must show that [his] employer intentionally discriminated against [him]." *Lynch v. Freeman*, 817 F.2d 380, 382 (6th Cir. 1987); *see also Lovas v. Huntington Nat'l Bank*, No. 99-3213, 2000 WL 712355, at *5 (6th Cir. May 22, 2000). Intent can be shown by direct evidence or inferred from a prima facie showing of discrimination. *Huguley*, 52 F.3d at 1370; *see also Shah v. Gen. Elec. Co.*, 816 F.2d 264, 267 (6th Cir. 1987) (proof of discriminatory motive can be inferred from differences in treatment). Ultimately, to prevail in this Title VII discrimination action, the plaintiff has to show that the adverse employment action would not have occurred except for his race. *Simon v. City of Youngstown*, 73 F.3d 68, 70 (6th Cir. 1995).

In order to demonstrate that he was "similarly situated" to the non-protected employees he claims were treated differently, "the plaintiff [must] demonstrate that he . . . is similarly-situated to the non-protected employee in all *relevant* respects." *Ercegovich v.*

13

*Goodyear Tire & Rubber Co.*, 154 F.3d 344, 353 (6th Cir. 1998). "In the disciplinary context, [the Sixth Circuit has] held that this requires that the plaintiff and the proposed comparator have engaged in acts of 'comparable seriousness.'" *Dickens v. Interstate Brands Corp.*, 384 F. App'x 465, 468 (6th Cir. 2010) (citing *Clayton v. Meijer, Inc.*, 281 F.3d 605, 611 (6th Cir. 2002)). The Sixth Circuit has stated the following regarding this analysis:

> Thus, to be deemed "similarly-situated," the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employers' treatment of them for it.

*Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 ( Cir. 1992). "[P]laintiff must prove that he and the white employee were similarly situated in all respects and that the other employee's acts were of comparable seriousness to his own." *Id.* (citing *Linear v. Safeway Grocery*, 843 F.2d 298 (8th Cir. 1988)).

In his affidavit presented in response to the motion for summary judgment,[8]

_____

[8] Although the affidavit refers by number to attached exhibits, none of the exhibits are numbered. None of the deposition excerpts have title pages for identification or authenticating certification pages. Also attached to plaintiff's affidavit are two unauthenticated letters to which defendant objects. One is from a former employer dated in 1986 and the other is a memo on Vitran Express letterhead dated in 2005 from an Andy Gordon addressed "To: Whom it May Concern." These are hearsay and irrelevant to the issues concerning plaintiff's termination in 2007.

In addition, plaintiff has attached a law review article to his response memorandum. While law review articles might be of academic interest, they are not evidence, at least not in this case. This court is concerned with evidence that demonstrates what happened to this plaintiff at his specific workplace and with evidence that raises a material issue of fact. This law review article does not advance plaintiff's position and is of no interest to the court.

plaintiff identifies individuals who are presumably other Vitran employees who he contends committed infractions but were not disciplined. Plaintiff, however, has provided only bare allegations without any record evidence or any attempt to demonstrate how these employees and their conduct are similarly situated to him. For example, he states, "On more than one occasion Carl Ellison refused loads at GE in my presence. Carl Ellison was not terminated as a result of his refusing to take additional loads at the GE plant." Plaintiff provides no information on who Carl Ellison is, when these incidents are alleged to have occurred, what the circumstances were, and whether any disciplinary action was taken and if so by what supervisor or manager. The same is true for all the other bare allegations concerning the employee incidents offered by plaintiff. No supporting or comparative information is provided to demonstrate how any of these employees and the alleged incidents make them similarly situated to the plaintiff. There is likewise no factual development to show or indicate that any of these alleged incidents were "comparable in seriousness" to the incident that resulted in plaintiff's termination. *Clayton*, 281 F.3d at 611. Plaintiff has not made a showing of disparate treatment.

Nevertheless, as stated above, plaintiff presented the deposition testimony of Elliott that indicates plaintiff was in all likelihood replaced by a white male. This would be sufficient to demonstrate the fourth and final element of a prima facie case. Defendant, however, also argues that plaintiff cannot establish a prima facie case because he cannot show that the person who made the decision to terminate him, Jeff Deaton, knew that

15

plaintiff is black. Defendant relies on *Seay v. Tennessee Valley Authority*, 340 F. Supp. 2d 832 (E.D. Tenn. 2004) in support of its position. "In *Seay*, the district court found that the burden shifting test and prima facie elements [of the intentional race discrimination case] 'cannot rationally create a reasonable inference of intentional race discrimination based on circumstantial evidence where the decision-maker . . . and his advisor/consultant . . . did not have actual knowledge of Seay's race.'" *Frazier v. USF Holland, Inc.*, No. 3:05-CV-230, 2006 WL 2987737, at *9 (E.D. Tenn. Oct. 17, 2006) (quoting *Seay*, 340 F. Supp. 2d at 842). In this case, plaintiff admitted in deposition testimony that he has no knowledge of who actually made the decision to terminate him. Defendant has shown that the decision maker was Deaton, but there is no proof that Deaton knew plaintiff's race.[9] Plaintiff admits he does not know Deaton and never personally met him. Without proof that Deaton knew plaintiff's race when the decision to terminate him was made, there can be no showing of intentional race discrimination. *Seay*, 340 F. Supp. 2d at 842.

Nevertheless, even assuming *arguendo* that the plaintiff has established a prima facie case of race discrimination, in the court's opinion, plaintiff cannot demonstrate pretext. The defendant has met its burden of stating a legitimate non-discriminatory reason for its adverse employment decision. Plaintiff was terminated for his unacceptable behavior with

---

[9] Terri Winters, Director of Human Resources, submitted the response to plaintiff's EEOC charge of discrimination made in December 2007, a portion of which has been submitted by plaintiff. The response, made after plaintiff was terminated, references plaintiff being the only black at the Knoxville terminal. While Winters was involved in the PPRC conference call in August 2007 that resulted in plaintiff's termination, there is no proof in the record that at time of the termination she or the decision maker Deaton knew that plaintiff was black.

16

defendant's customer and the customer's employee Dorothy Rush.

Once defendant has stated a legitimate, non-discriminatory reason for its adverse action, plaintiff must show that defendant's proffered reason is a pretext for discrimination. "[P]laintiff must produce sufficient evidence from which the jury may reasonably reject the employer's explanation." *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1083 (6th Cir. 1994), *abrogated on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009); *see also Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 804 (6th Cir. 1994) (plaintiff must do more than impugn employer's asserted justification; "plaintiff must also adduce evidence of the employer's discriminatory animus").

With regard to pretext, the Sixth Circuit has stated:

> To raise a genuine issue of material fact on the validity of an employer's explanation for an adverse job action, the plaintiff must show, again by a preponderance of the evidence, either (1) that the proffered reasons had no basis in fact; (2) that the proffered reasons did not actually motivate the action; or (3) that they were insufficient to motivate the action.

*Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 883 (6th Cir. 1996)(citations omitted); *see also Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 n.4 (6th Cir. 2009) (the court asks "whether the plaintiff has produced evidence that casts doubt on the employer's explanation, and, if so how strong it is."). "To prove pretext, the plaintiff must introduce admissible evidence to show 'that the proffered reason was not the true reason for the employment decision' and that racial animus was the true motivation driving the employer's determination." *Barnes v. United Parcel Serv.*, 366 F. Supp. 2d 612, 616 (W.D. Tenn. 2005) (quoting *St. Mary's Honor*

17

*Ctr. v. Hicks*, 509 U.S. 502, 508 (1993)).   Plaintiff "must produce sufficient evidence from which the jury could reasonably reject [the defendant's] explanation and infer that the defendants intentionally discriminated against him." *Braithwaite v. Timken*, 258 F.3d 488, 493 (6th Cir. 2001) (internal quotation marks and citations omitted).   At all times, the ultimate burden of persuasion remains with the plaintiff. *Burdine*, 450 U.S. at 253.

Plaintiff is unable to show pretext by claiming there is no basis in fact for defendant's action.  Plaintiff's own deposition testimony demonstrates that he tried to engage Rush as a witness in any future confrontation with his employer.  Rush told him she would not be a witness, and plaintiff mentioned that he could subpoena her.  There is clearly a factual basis for the subject incident.

Further, plaintiff cannot establish that the reasons given were insufficient to motivate plaintiff's discharge.  GE is one of defendant's largest if not the largest customer for the Knoxville terminal.  Customer service is obviously important to the type of highly competitive business defendant operates.  Telling a customer that you plan to sue your employer and threatening to subpoena the customer's employee as a witness is understandably not good customer relations.  Plaintiff attempts to argue that other employees engaged in inappropriate conduct with customers without any consequences.  However, plaintiff has failed to offer proof of such incidents.   What has been offered are unsubstantiated, bare allegations that certain employees engaged in offensive conduct with customers without being disciplined or fired.  Bare conclusory allegations are not enough to

18

overcome summary judgment. The Sixth Circuit "has long held that '[m]ere conclusory and unsupported allegations, rooted in speculation, do not meet that burden.'" *Bell v. Ohio State Univ.*, 351 F.3d 240, 253 (6th Cir. 2003); *see also Innovative Case, Inc. v. Tweddle Litho Co.*, 147 F. App'x 467, 473 (6th Cir. 2005); *Lamping v. Walraven*, 30 F. App'x 577, 580 (6th Cir. 2002). Furthermore, no specific details about these alleged incidents have been provided or developed, and there is no record evidence of any kind to substantiate them. Plaintiff cannot show that he is similarly situated to other employees without sufficient proof. *See Mitchell*, 964 F.2d at 583.

In an attempt to show that the proffered reason did not actually motivate the decision, plaintiff argues that there was a conspiracy orchestrated by Elliott. Plaintiff points out that Elliott testified inconsistently in plaintiff's unemployment appeals hearing and in his deposition concerning when he heard from GE about the subpoena threat. In the appeals hearing he said he heard about the issue on Monday, August 6. At his deposition, he remembered the email he sent the evening of August 3, 2007. He recalled that he completed the NFI regarding the incident before he called Rush to apologize. Elliott's email to Hartman reporting the incident, which included the information he received when he called Rush to apologize, was sent at 9:55 p.m. on August 3, 2007. The NFI is an attachment to that email.

Ultimately, the discrepancy in Elliott's testimony is not significant or material. Whether he learned about the conduct with Rush on Friday night August 3 or Monday August 6 does not alter the fact that the customer made complaints about plaintiff's conduct,

19

and that was the basis for defendant's decision to terminate plaintiff's employment. Collver's complaint, sent on Monday, August 6, significantly states, "According to Dorothy." There is no indication that Collver was relying solely on information from Elliott or filtered through Elliott.

Plaintiff also seeks to further his conspiracy theory by claiming that all of his disciplinary problems are because of Elliott, so Elliott was motivated to conspire with the client to get him fired. However, as discussed above, plaintiff has not demonstrated that he was treated differently than similarly situated non-protected employees. Joe Kitts testified that Elliott wrote up other employees besides the plaintiff. Plaintiff simply has not shown that he was singled out because of his race by Elliott. Plaintiff also attempts to show a connection between Elliott and former Vitran now GE employee Mike Hudson to further the conspiracy theory. He speculates that because Elliott "may" have spoken to Hudson the night of the incident, Elliott's credibility is in question. First, Elliott did not say he actually spoke with Hudson on the night of August 3, though it was possible. Second, Elliott stated that he did inform Hudson of the situation because he did not want to lose the GE business and the revenue generated from that business. This testimony does not advance a race discrimination conspiracy theory.

The arguments and documentation offered by plaintiff fail to raise a material issue of fact concerning pretext. The evidence offered fails to cast doubt on the stated reason for plaintiff's termination. Therefore, plaintiff has not sustained his burden of presenting

20

sufficient evidence for a jury to reasonably reject defendant's reason for terminating him. *Braithwaite*, 258 F.3d at 493.

In addition, while plaintiff disagrees that he told Rush he would sue Vitran and that he threatened to subpoena Rush as a witness, he nonetheless has not presented proof that the defendant, in the decision maker Deaton, did not honestly believe that he did that based upon the complaints from the customer, GE. Defendant "is not liable if it acted upon an honest belief in its non-discriminatory reason and made a reasonably informed and considered decision." *Ladd v. Grand Trunk W.R.R., Inc.*, 552 F.3d 495, 503 (6th Cir. 2009).

> [Plaintiff's] disagreement with the facts uncovered in [the employer's] investigation does not create a genuine issue of material fact that would defeat summary judgment as long as an employer has an honest belief in its proffered nondiscriminatory reason. The key inquiry in assessing whether an employer holds such an honest belief is whether the employer made a reasonably informed and considered decision before taking the complained-of action. An employer has an honest belief in its rationale when it reasonably relied on the particularized facts that were before it at the time the decision was made. [W]e do not require that the decisional process used by the employer be optimal or that it left no stone unturned.

*Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 598-99 (6th Cir. 2007) (internal quotation marks and citations omitted). As noted above, in his complaining email, Collver, a manager who is located in the same Mascot facility as Rush, states, "According to Dorothy." Thus, Collver is making a complaint about plaintiff based on information that is coming from Rush herself. Plaintiff has offered only unsubstantiated theories not proof that defendant did not honestly believe the complaints from Rush and Collver about the incident.

21

This is not enough. Nothing plaintiff has offered sufficiently questions defendant's reliance on the particularized facts from the client's complaint concerning the incident. The end result is that plaintiff has failed to show that his termination would not have occurred except for his race. *Simon,* 73 F.3d at 70; *Seay*, 340 F. Supp. 2d at 840.


## IV.

### *Conclusion*

Accordingly, for the reasons stated above, defendant's motion for summary judgment will be granted, and this case will be dismissed. An order consistent with this opinion will be entered.


ENTER:


_____
s/ Leon Jordan
United States District Judge

22